UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CR. NO. 1:22-CR- |
| | : | |
| v. | : | |
| | : | (Judge                    ) |
| **JAMES A. COCCAGNA**, | : | |
| | : | |
| Defendant. | : | (Electronically Filed) |

# I N F O R M A T I O N

THE UNITED STATES ATTORNEY CHARGES:

At times material to this Information:

## COUNT 1
18 U.S.C. § 371
(Conspiracy to Commit Major Fraud Against the United States)

## BACKGROUND

1. The defendant, JAMES A. COCCAGNA, was a resident of

Chambersburg, Pennsylvania, in the Middle District of Pennsylvania.

2. COCCAGNA worked at Letterkenny Army Depot, near

Chambersburg, PA, from on or about April 1978 until on or about May

2018.

3. Letterkenny Army Depot ("Letterkenny") was a U.S. Army

facility under the command structure of the U.S. Army Aviation and

Missile Command. It was founded in or around 1942. Following the terrorist attacks of September 11, 2001, Letterkenny played a significant role in the maintenance and modification of ground mobility vehicles and missile systems used in U.S. war efforts.

4. From about 1996 until about 2018, COCCAGNA was the Chief of the Engineering and Planning Division in the Directorate of Public Works at Letterkenny. In this role, he was responsible for overseeing and managing the real property maintenance and construction work at Letterkenny. During this time period, a large portion of this work was performed through contracts awarded to private companies, and COCCAGNA was also responsible for managing these contracts.

5. COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 were business partners in the field of construction.

6. COCONSPIRATOR 4 was affiliated with a construction company with an address in Bethel Park, Pennsylvania.

7. COCONSPIRATOR 4 and her company, 8(A) COMPANY 1, were participants in the U.S. Small Business Administration's 8(a)

Business Development Program ("8(a) Program"). 8(A) COMPANY 1 was also a certified Women-Owned Small Business.

8. 8(A) COMPANY 2 was a participant in the 8(a) Program and was associated with addresses in Pennsauken, NJ and in and around Reading, PA.

9. 8(A) COMPANY 3 was a participant in the 8(a) Program and was associated with addresses in Quinton, VA and Pittsburgh, PA.

10. 8(A) COMPANY 4 was a participant in the 8(a) Program and was associated with an address in Butler, PA.

11. The 8(a) Program was designed to help socially and economically disadvantaged entrepreneurs gain access to and succeed in the marketplace for federal government contracts. One of the primary means through which it achieved this goal was by creating reserved federal contracting opportunities for its participants, like the real property maintenance and construction contracts for which COCCAGNA had management responsibility. These were known as "small business set-aside" contracts.

12. An 8(a) Program participant was eligible to participate in the Program for a period of nine years from the date of SBA's approval

3

letter certifying its admission to the program. The participant had to maintain its eligibility during its tenure in the Program and had to inform the SBA of any changes that would adversely affect its Program eligibility. A firm that completed its nine-year term of participation in the 8(a) Program was deemed to have graduated from the program.

13. Under 8(a) Program rules, in order to be awarded a small business set-aside contract or an 8(a) contract for general construction work, an 8(a) Program participant had to agree to perform at least 15% of the cost of the contract with its own employees.

14. In order to enter and remain in the 8(a) Program, a company had to be a small business that was unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who were of good character and citizens of and residing in the United States.

15. Many of the construction contracts awarded by Letterkenny from the late 1990s until the time of COCCAGNA's retirement in 2018 were through the 8(a) Program. As a result, the only companies eligible to bid on and win these construction contracts were those that had

qualified for entry into the 8(a) Program and continued to meet the eligibility requirements.

16. COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 were not eligible for entry into the 8(a) Program and, consequently, could not secure 8(a) Program set-aside contracts on their own.

17. Letterkenny's contracting office generally issued construction contracts through a vehicle known as a job order contract ("JOC").

18. With a JOC, a contract for a specified dollar amount was awarded to a prime contractor, and individual jobs or tasks could then be performed until the entire contract value was used up. A JOC could be either for one year with the possibility of renewal or for a period of several years.

19. COCCAGNA's office, the Directorate of Public Works ("DPW"), asked the Letterkenny contracting office to authorize a JOC for construction work. Hence, DPW was the "requiring activity" for the contract. These requests were generally made when COCCAGNA himself indicated that another JOC was needed. COCCAGNA also developed the scope of work for these JOCs. When DPW, through

COCCAGNA, requested that another JOC be issued, the contracting office generally followed these recommendations.

20. COCCAGNA also provided the contracting office names of 8(a) Program participants that he believed the contracting office should consider for these contracts. After being recommended to the contracting office, these companies were then invited to submit technical proposals, which included a description of the company, its abilities, its past work experience, and key personnel summaries, which were like résumés.

21. A company interested in a contract also submitted a cost proposal in the form of a coefficient. With a JOC, a coefficient was generally supposed to account for a contractor's overhead and profits. It represented the markup or multiplier over specified direct cost items that a company proposed to charge for its services. The lower a company's coefficient, the cheaper the company's services were to the entity issuing the contract, in this case Letterkenny Army Depot.

22. Companies placing bids provided their coefficients directly to the contracting office, and these coefficients were generally not included in the information given to COCCAGNA.

6

23. COCCAGNA was also the assigned contracting officer's representative or "COR" on the construction contracts that were initiated by DPW and issued to 8(a) Program participants. COCCAGNA's training as a COR instructed him to be "the eyes and ears" of the contracting officers at Letterkenny Army Depot.

24. Until in or around 2008, the construction contracts managed by COCCAGNA were non-competitive, direct-award contracts. In other words, Letterkenny Army Depot could select prime contractors for these contracts without a competitive bidding process.

25. When making direct, non-competitive awards for construction contracts, the Letterkenny contracting office relied on COCCAGNA's recommendations. COCCAGNA, therefore, had significant input into when the Letterkenny contracting office issued new construction contracts and the parties to whom those contracts were awarded.

26. Until about 2005, 8(A) COMPANY 2 was affiliated with COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3, and it was awarded a construction contract at Letterkenny in 2003. This contract was renewed in 2004 and 2005. The cumulative value of it was around $6 million.

7

27. From about 2005 until about 2008, 8(A) COMPANY 3 was affiliated with COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3, and it was awarded construction contracts at Letterkenny Army Depot in 2005, 2006, and 2007. Each of these three contracts was approximately in the $3 million to $3.5 million range.

28. From about 2007 until about 2010, 8(A) COMPANY 4 was affiliated with COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3, and it was awarded construction contracts at Letterkenny Army Depot in 2007, 2008, and 2009. The collective value of its four construction contracts was around $25 million.

29. Starting in or around 2008, construction contracts at Letterkenny that were managed by COCCAGNA started being awarded to 8(a) Program participants through a competitive bidding process.

30.  In or around 2008, 8(A) COMPANY 4, with COCCAGNA's recommendation, was awarded a JOC worth just under $15 million. This JOC was awarded through a competitive bidding process. 8(A) COMPANY 4 was one of several companies whose proposals were found to be capable of being made technically acceptable, and it won the

8

contract because it submitted the lowest total coefficient by a small margin over the second-lowest bidder.

31. COCCAGNA also had significant input into the dollar amounts associated with the contracts that he managed. Until in or around 2008, the dollar limit on construction JOCs issued by Letterkenny was about $3.5 million. On several occasions between 2007 and 2009, the dollar limit on these contracts was increased following COCCAGNA's recommendations to the Letterkenny contracting office.

32. From about 2007 until about 2014, 8(A) COMPANY 1 was affiliated with COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3, and it was awarded construction contracts at Letterkenny Army Depot in 2007, 2008, and 2009. The collective value of its construction contracts was over $70 million, including a competitive JOC worth about $60 million that it was awarded in or around 2009.

33. Collectively, the value of contracts at Letterkenny that were awarded to 8(a) Program participants affiliated with COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 exceeded $100 million from about 2003 until 2009.

9

## THE CONSPIRACY AND ITS OBJECTS

34.  Paragraphs 1 through 33 are incorporated here.

35. From on or about 2003 until on or about 2014, in Franklin County, within the Middle District of Pennsylvania, and elsewhere, the defendant,

### JAMES A. COCCAGNA,

did knowingly conspire, confederate, and agree, together and with other persons both known and unknown to the United States, to commit offenses against the United States and to defraud the United States, that is:

To knowingly and willfully execute a scheme and artifice with the intent to defraud the United States and to obtain money or property by means of false or fraudulent pretenses, representations, or promises, in any procurement of property and services as a prime contractor with the United States and as a subcontractor and supplier on a contract in which there was a prime contract with the United States, and the value of such contract and subcontract, and any constituent part thereof, was $1,000,000 or more, in violation of Title 18, United States Code, Section

10

1031.

## MANNER AND MEANS OF THE CONSPIRACY

36. COCONSPIRATOR 1, COCONSPIRATOR 2, and
COCONSPIRATOR 3 formed relationships with 8(a) Program
participants.

37. From on or about 2003 until on or about 2008,
COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3
submitted proposals for 8(a) Program set-aside construction contracts at
Letterkenny under the names of 8(A) COMPANY 1, 8(A) COMPANY 2,
8(A) COMPANY 3, and 8(A) COMPANY 4.

38. COCCAGNA was responsible for evaluating the technical
components of each contract offer. COCCAGNA knew that 8(A)
COMPANY 1, 8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A)
COMPANY 4 were all affiliated with COCONSPIRATOR 1,
COCONSPIRATOR 2, and COCONSPIRATOR 3. COCCAGNA also
became familiar with the style of proposal written by
COCONSPIRATOR 2, which he recognized and knew to be associated

with COCONSPIRATOR 1, COCONSPIRATOR 2, and

COCONSPIRATOR 3.

39. COCCAGNA recommended each of these companies for

selection by the Letterkenny contracting office on the basis of their

affiliation with COCONSPIRATOR 1, COCONSPIRATOR 2, and

COCONSPIRATOR 3. When making these recommendations,

COCCAGNA did not disclose to the contracting office that these 8(a)

Program participants were affiliated with COCONSPIRATOR 1,

COCONSPIRATOR 2, and COCONSPIRATOR 3 or that

COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3

were previously affiliated with other 8(a) Program participants.

40. Following COCCAGNA's recommendations, the 8(a) Program

participants affiliated with COCONSPIRATOR 1, COCONSPIRATOR

2, and COCONSPIRATOR 3—8(A) COMPANY 1, 8(A) COMPANY 2,

8(A) COMPANY 3, and 8(A) COMPANY 4 –were each selected for a

series of construction contracts managed by COCCAGNA.

41. The socially and economically disadvantaged individuals who,

on paper, owned and controlled 8(A) COMPANY 2, 8(A) COMPANY 3,

and 8(A) COMPANY 4 were rarely, if ever, present at Letterkenny.

Likewise, equipment bearing the names of 8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A) COMPANY 4 was rarely, if ever, utilized at Letterkenny.  These individuals and their existing employees, if any, played no meaningful role in the execution of contracts they were awarded at Letterkenny.

42. COCCAGNA was introduced to COCONSPIRATOR 4 at a meeting that took place at Letterkenny in or around 2007. Around the time of this meeting, COCONSPIRATOR 4's company, 8(A) COMPANY 1, began receiving 8(a) Program set-aside contracts at Letterkenny.

43. Like the other 8(a) Program participants affiliated with COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3, neither COCONSPIRATOR 4 nor her company, 8(A) COMPANY 1, had any meaningful presence at Letterkenny following this initial meeting. COCONSPIRATOR 4 and her existing employees, if any, played no meaningful role in the execution of contracts that 8(A) COMPANY 1 was awarded at Letterkenny.

44. COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 prepared contract and job proposals for 8(A) COMPANY 1, just as they had done for 8(A) COMPANY 2, 8(A)

13

COMPANY 3, and 8(A) COMPANY 4. Furthermore, COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 ran all of 8(A) COMPANY 1's Letterkenny contracts on a day-to-day basis, just as they had done for 8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A) COMPANY 4. 8(A) COMPANY 1 did not perform work on site at Letterkenny with its own employees, just as, before it, 8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A) COMPANY 4 did not perform work at Letterkenny with its own employees.

45. COCCAGNA held hundreds of site visits on jobs associated with contracts awarded to 8(A) COMPANY 1, 8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A) COMPANY 4. COCONSPIRATOR 1 was a regular attendee at these meetings, as were a couple of his site superintendents. COCONSPIRATOR 1 and his employees regularly signed into these meetings as employees of 8(A) COMPANY 1, 8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A) COMPANY 4, depending on which company was then handling the JOC. COCCAGNA then prepared a memorandum of the site visit, adopting the representations made by COCONSPIRATOR 1 and his employees. This memorandum became part of the relevant contract file.

14

46. For several years starting around 2007, COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 were simultaneously affiliated with both 8(A) COMPANY 1 and 8(A) COMPANY 4. The representations made by COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 about which company they were affiliated with depended on which contract a job fell under, but the performance of the work itself was otherwise unaffected by whether it was a job done, on paper, by 8(A) COMPANY 1 or 8(A) COMPANY 4.

47. As stated above, on several occasions between 2007 and 2009, the dollar limit on construction contracts managed by COCCAGNA was increased. Each time an increase occurred, COCCAGNA made a recommendation to the Letterkenny contracting office to increase the dollar limit to a specific amount—first, from $3.5 million to $15 million in or around 2008, then from $15 million to $60 million in or around 2009. The contracting office accepted each of COCCAGNA's recommendations.

<u>OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY</u>

48. At the meeting in or around 2007 attended by COCCAGNA, COCONSPIRATOR 1, COCONSPIRATOR 2, COCONSPIRATOR 3, and

15

COCONSPIRATOR 4, it was discussed that COCONSPIRATOR 4 would, if selected for 8(a) Program set-aside construction contracts, also utilize favored subcontractors previously utilized by COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 to perform work on the contracts awarded to her company, 8(A) COMPANY 1.

49. The 2009 JOC that ended up being worth around $60 million was awarded to 8(A) COMPANY 1 through a competitive bidding process. Prior to the interested parties' submission of best-and-final offers, COCCAGNA evaluated the proposals submitted by each of the two offerors, including 8(A) COMPANY 1. He found both proposals to be capable of being made technically acceptable.

50. COCCAGNA was aware that the primary determinant of which party got the contract would be the cost coefficient. With this contract, the offerors' coefficient information was included in the package COCCAGNA received, but the information was redacted. COCCAGNA was, nevertheless, able to see these figures by turning the pages over and looking at them through the back of the sheets on which they were written. COCCAGNA therefore gained access to bidding information that he was not supposed to have.

16

51. Around this same time, COCONSPIRATOR 1 stopped by COCCAGNA's office. COCONSPIRATOR 1 asked COCCAGNA whether 8(A) COMPANY 1's bid would be successful. COCCAGNA told COCONSPIRATOR 1 that their coefficient would be fine, signaling that no further revision of that figure would be necessary to win the contract.

52. COCONSPIRATOR 1 thus solicited confidential information from COCCAGNA that COCCAGNA was not supposed to have and which COCONSPIRATOR 1 was not supposed to receive. COCCAGNA shared this confidential information.

53. COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 moved laborers, on paper, onto the payrolls of 8(A) COMPANY 1, 8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A) COMPANY 4 to make it appear, falsely, as if these 8(a) Program participants were complying with the requirement that they perform 15% of the cost of a contract with their own employees. COCONSPIRATOR 1 described this practice to COCCAGNA, COCCAGNA understood this was a violation of the rules and purpose of the 8(a) Program, and yet COCCAGNA continued to assist

17

COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3, and their chosen 8(a) Program participants, in securing construction contracts that he managed.

54. The 2009 JOC awarded to 8(A) COMPANY 1, with total value of approximately $60 million, contained a contractual provision requiring 8(A) COMPANY 1 to "perform on the site, and with its own organization, work equivalent to at least 10 percent of the total amount of work to be performed under the contract." COCCAGNA and COCONSPIRATOR 1 had a discussion that 8(A) COMPANY 1 would make it appear, falsely, that the company was satisfying this requirement by moving onsite laborers onto 8(A) COMPANY 1's payroll.

All in violation of Title 18, United States Code, Section 371.

GERARD M. KARAM

United States Attorney

RAVI ROMEL SHARMA
Assistant United States Attorney

11/30/2022

Date

18