

| Subject:<br>**JAMES A. COCCAGNA**<br>Statement of Facts | Date:<br>November 30, 2022 |
|---|---|

The defendant, JAMES A. COCCAGNA, admits the following facts, which the Government would have proved beyond a reasonable doubt had this case proceeded to trial.

*Summary*

JAMES A. COCCAGNA was part of a conspiracy to commit offenses against the United States, namely, major fraud against the United States pursuant to Title 18, U.S.C. § 1031 beginning in or around 2003 and continuing until in or around 2014.

From about 1996 until about 2018, COCCAGNA was the Chief of the Engineering and Planning Division in the Directorate of Public Works at Letterkenny Army Depot, in Chambersburg, PA, in the Middle District of Pennsylvania. In this role, he was responsible for overseeing and managing the real property maintenance and construction work at Letterkenny Army Depot, a U.S. Army facility under the command structure of the U.S. Army Aviation and Missile Command. Many of the maintenance and construction contracts awarded by Letterkenny Army Depot from the late 1990s until the time of COCCAGNA's retirement in 2018 were through the U.S. Small Business Administration's 8(a) Business Development Program. As a result, the only companies eligible to bid on and win these maintenance and construction contracts were those that had qualified for entry into the 8(a) Program.

The 8(a) Program was designed to help socially and economically disadvantaged entrepreneurs gain access to and succeed in the marketplace for federal government contracts. One of the primary means through which it achieves this goal is by creating reserved

federal contracting opportunities for its participants, like the real property maintenance and construction contracts for which COCCAGNA had management responsibility.

COCCAGNA conspired with others known and unknown to the United States—including COCONSPIRATOR 1, COCONSPIRATOR 2, COCONSPIRATOR 3, and, at times, COCONSPIRATOR 4—to defeat the rules and purpose of the 8(a) Program by steering federal government contracts to certain participants in the 8(a) Program, knowing that those companies, their management, and their existing employees, if any, were not playing any meaningful role in performing contracts awarded to them.

COCONSPIRATOR 1, COCONSPIRATOR 2, COCONSPIRATOR 3, and 8(a) Program participants, including COCONSPIRATOR 4, executed a scheme with the intent to obtain money and property by means of false and fraudulent pretenses, representations, and promises in federal government prime contracts with the United States, and the value of each of these prime contracts, as described further below, exceeded $1,000,000. COCCAGNA conspired with these individuals to accomplish this scheme and assisted them in the achievement of this scheme by helping in various ways to get contracts awarded to certain 8(a) Program participants controlled by COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3, including COCONSPIRATOR 4's company, 8(A) COMPANY 1.

*8(a) Small Business Development Program*

The 8(a) Program had certain requirements during the relevant time period. These requirements included, but were not limited to, the following relevant provisions under federal law:

Under 13 C.F.R. § 124.2, 8(a) Program participants were granted a period of eligibility, with the possibility of early graduation if the company outgrew its small business status or termination if the company did not comply with Program requirements. The participant had to maintain its eligibility during its tenure in the Program and had to inform the SBA of any changes that would adversely affect its Program eligibility.

2

Additionally, under 13 C.F.R. § 125.6(a)(3), in order to be awarded a small business set-aside contract or an 8(a) contract for general construction, an 8(a) Program participant had to agree to perform at least 15% of the cost of the contract with its own employees.

Furthermore, under 13 C.F.R. § 124.101, companies that participated in the 8(a) Program had to be small business concerns that were unconditionally owned and controlled by socially and economically disadvantaged individuals who were of good character and citizens and residents of the United States.

### *The Formation of the Conspiracy and Early Years*

COCCAGNA initially learned of COCONSPIRATOR 1 and COCONSPIRATOR 2 because the two men were performing work on contracts that the U.S. Army Corps of Engineers awarded to 8(a) Program participants, including contracts for services at Letterkenny Army Depot, starting in or around 1998.

Around the same time, a decision was made by Letterkenny Army Depot's contracting office that the 8(a) Program would likewise be utilized for many maintenance and construction contracts managed by COCCAGNA. Consequently, when a contract that he managed was designated as an 8(a) Program set-aside contract, it would be eligible only to 8(a) Program participants.

Following the terrorist attacks of September 11, 2001, the volume of work at Letterkenny Army Depot supporting war efforts went up substantially, and it continued to grow over the ensuing years. As a result, the volume of maintenance and construction work required by Letterkenny Army Depot also increased. COCCAGNA wanted to ensure that this maintenance and construction work kept pace with the overall demands on Letterkenny Army Depot.

From in or around 2003 until in or around 2008, COCONSPIRATOR 1 and COCONSPIRATOR 2, and later in this time period, COCONSPIRATOR 3, had relationships with a series of 8(a) Program participants. Initially, they were affiliated with a company known as 8(A) COMPANY 2. 8(A) COMPANY 2 was awarded a Letterkenny Army Depot maintenance and construction contract in

3

2003, and this contract was renewed in 2004 and 2005. The cumulative value of it was around $6 million.

COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 were next affiliated with an 8(a) Program participant known as 8(A) COMPANY 3. 8(A) COMPANY 3 was awarded maintenance and construction contracts at Letterkenny Army Depot in 2005, 2006, and 2007. Each of these three contracts was approximately in the $3 million to $3.5 million range.

COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 were next affiliated with an 8(a) Program participant known as 8(A) COMPANY 4. 8(A) COMPANY 4 was awarded maintenance and construction contracts at Letterkenny Army Depot in 2007, 2008, and 2009. The collective value of these four contracts was around $25 million.

Until in or around 2008, the maintenance and construction contracts run by COCCAGNA were non-competitive, direct-award contracts. In other words, Letterkenny Army Depot could select prime contractors without a competitive bidding process. COCCAGNA understood that the contracting office trusted and relied on his judgment and would generally accept his recommendation for which 8(a) Program participant to select for these contracts.

8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A) COMPANY 4 were each awarded maintenance and construction contracts after COCCAGNA recommended to Letterkenny Army Depot's contracting office that they be selected. COCCAGNA supported and recommended these companies because he knew that they were managed by and affiliated with COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3. COCCAGNA wanted all of the maintenance and construction work under his supervision to be managed by COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 because he was satisfied with their work and they could, in his view, handle the growing demands of Letterkenny Army Depot.

On paper, 8(A) COMPANY 2 was owned and operated by a man named 8(A) COMPANY 2 OWNER, but COCCAGNA does not recall

4

8(A) COMPANY 2 OWNER ever coming to Letterkenny Army Depot during the contract period or having contact with him otherwise. COCCAGNA never saw any equipment bearing the 8(A) COMPANY 2 name on site at Letterkenny Army Depot.

On paper, 8(A) COMPANY 3 was owned and operated by a man named 8(A) COMPANY 3 OWNER, but COCCAGNA does not recall 8(A) COMPANY 3 OWNER ever coming to Letterkenny Army Depot during the contract period or having contact with him otherwise. COCCAGNA never saw any equipment bearing the 8(A) COMPANY 3 name on site at Letterkenny Army Depot.

On paper, 8(A) COMPANY 4 was owned and operated by a man named 8(A) COMPANY 4 OWNER, but COCCAGNA does not recall 8(A) COMPANY 4 OWNER ever coming to Letterkenny Army Depot during the contract period or having contact with him otherwise. COCCAGNA never saw any equipment bearing the 8(A) COMPANY 4 name on site at Letterkenny Army Depot.

Furthermore, to COCCAGNA's knowledge, none of these companies—8(A) COMPANY 2, 8(A) COMPANY 3, or 8(A) COMPANY 4—ever sent any employees to Letterkenny Army Depot to perform any work. At an early point in COCCAGNA's relationship with COCONSPIRATOR 1, COCONSPIRATOR 1 explained to COCCAGNA that he, COCONSPIRATOR 2, and COCONSPIRATOR 3 moved personnel onto the payrolls of 8(a) Program participants that they were affiliated with to make it appear, falsely, as if these companies were performing work on site with their own employees. To COCCAGNA, it was obvious that this was not a legitimate way of complying with the 8(a) Program's self-performance requirements for prime contractors. COCCAGNA recognized this as a violation of the 8(a) Program. Still, COCCAGNA continued to recommend companies affiliated with COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 for additional contracts.

The maintenance and construction contracts managed by COCCAGNA were awarded through a contract vehicle known as a job order contract or "JOC." Sometimes these contracts were also referred

to, alternatively, as indefinite delivery, indefinite quantity (IDIQ) contracts or task order contracts, which are functionally equivalent.

With a JOC, a contract for a specified dollar amount is awarded to a prime contractor, and individual jobs or tasks may then be performed until the entire contract value is used up. A JOC may be either for one year with the possibility of renewal or for a period of several years.

The contracts that COCCAGNA managed typically proceeded in the following manner:

COCCAGNA's office, the Directorate of Public Works (DPW), asked the Letterkenny Army Depot contracting office to authorize a JOC for maintenance and construction work. Hence, DPW was the "requiring activity" for the contract. These requests were generally made when COCCAGNA himself indicated that another JOC was needed. COCCAGNA also developed the scope of work for these JOC contracts. When DPW, through COCCAGNA, requested that another JOC be issued, the contracting office generally followed these recommendations.

COCCAGNA also provided the contracting office names of 8(a) Program participants that he believed the contracting office should consider for these contracts. During this period of time, COCCAGNA recommended 8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A) COMPANY 4 to the contracting office based on their affiliation with COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3.

After being recommended to the contracting office, these companies were then invited to submit technical proposals, which included a description of the company, its abilities, its past work experience, and key personnel summaries, which were like résumés.

A company interested in a contract also submitted a cost proposal in the form of a coefficient. With a JOC, a coefficient is generally supposed to account for a contractor's overhead and profits. It represents the markup or multiplier over specified direct cost items that a company proposes to charge for its services. For instance, a coefficient of 1.15 means that a contractor proposes to charge a 15% markup for its

services on top of its own costs. The lower a company's coefficient, the cheaper the company's services to the entity issuing the contract.

COCCAGNA was also the assigned contracting officer's representative or "COR" on the maintenance and construction contracts that were initiated by DPW and issued to 8(a) Program participants. COCCAGNA's training as a COR instructed him to be "the eyes and ears" of the contracting officers at Letterkenny Army Depot.

As a COR, COCCAGNA was responsible for evaluating technical proposals for the maintenance and construction contracts that he managed. COCCAGNA became familiar with the style of technical proposals written by COCONSPIRATOR 2, and he therefore understood that he was reviewing a proposal prepared by COCONSPIRATOR 2 whenever he received a technical proposal for 8(A) COMPANY 2, 8(A) COMPANY 3, or 8(A) COMPANY 4.

Companies placing bids provided their coefficients directly to the contracting office, and these coefficients were generally not included in the information given to COCCAGNA.

COCCAGNA then provided to the contracting office a favorable evaluation of the technical proposals submitted by 8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A) COMPANY 4. COCCAGNA was also generally asked by the contracting office to provide an evaluation of the contractor's past performance. COCCAGNA always provided a positive review of any company affiliated with COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3.

COCCAGNA knew that the contracting officers responsible for selecting contractors were removed from the day-to-day work occurring at Letterkenny Army Depot. As a result, they would not have generally been in a position to see that the 8(a) Program participants selected for these contracts were not meeting the 15% self-performance requirement and, otherwise, played no meaningful role in the execution of these contracts. COCCAGNA did not, however, disclose to the contracting office the fact that COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 were moving from one 8(a) program participant to the next, that these companies to COCCAGNA's knowledge were not

7

performing any labor on site with their own employees, or that COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 were moving actual laborers onto the payrolls of the 8(a) Program participants to create the false appearance that those companies were performing work.

The Letterkenny Army Depot real property planning board generally met a couple of times each year. In connection with these meetings, this planning board accepted proposals from COCCAGNA and his engineering division staff, and others, on projects that needed to be performed around Letterkenny and the appropriate budgets for such projects. The planning board then determined the individual projects to be accomplished through the contract process, along with their associated budgets, which were then assigned to COCCAGNA for accomplishment through a JOC. When a project—such as repairs to a specific building at Letterkenny Army Depot—was scheduled to be performed, the prime contractor was invited to attend an initial site visit to discuss the scope of work. Relevant subcontractors were also generally present for these meetings.

COCCAGNA held hundreds of site visits on jobs associated with 8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A) COMPANY 4. COCONSPIRATOR 1 was a regular attendee at these meetings, as were a couple of his site superintendents. COCONSPIRATOR 1 and his employees regularly signed into these meetings as employees of 8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A) COMPANY 4, depending on which company was then handling the JOC. COCCAGNA then prepared a memorandum of the site visit, adopting the representations made by COCONSPIRATOR 1 and his employees. This memorandum became part of the relevant contract file.

After discussing the scope of work at an initial site visit, the prime contractor then submitted a proposal for that job. COCCAGNA recognized that individual job proposals submitted by 8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A) COMPANY 4 were again in COCONSPIRATOR 2's writing style.

COCCAGNA and his engineering division staff were responsible for coming up with an independent government estimate or "IGE" for a

given job. The IGE represented the government's determination for how much the job should reasonably cost. At times, COCCAGNA deferred to his engineering division staff to develop an IGE on its own, and at other times he worked with them to develop an IGE. Irrespective of which approach was taken, COCCAGNA had authority over this process.

A job proposal was generally accepted if the proposed cost came in lower than the IGE. When COCCAGNA worked with COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3, COCCAGNA at times ensured that the difference between the contractor's proposed cost and the IGE would be spent on additional work that was outside the scope of the specified job. COCCAGNA knew that this was a violation of government contracting rules.

After the government accepted the proposal, the job would be performed. Several hundred jobs were completed through contracts awarded to 8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A) COMPANY 4.

Until approximately 2008, the dollar limit on maintenance and construction JOCs issued by Letterkenny Army Depot was about $3.5 million. On several occasions between 2007 and 2009, the dollar limit on these contracts was increased. Each time an increase occurred, COCCAGNA made a recommendation to the Letterkenny Army Depot contracting office to increase the dollar limit to a specific amount—first, from $3.5 million to $15 million in or around 2008, then from $15 million to $60 million in or around 2009. The contracting office accepted each of COCCAGNA's recommendations.

In 2008, 8(A) COMPANY 4, with COCCAGNA's recommendation, was awarded a JOC worth just under $15 million. This JOC was awarded through a competitive bidding process. 8(A) COMPANY 4 was one of several companies whose proposals were found to be capable of being made technically acceptable. 8(A) COMPANY 4 won the contract because it submitted the lowest total coefficient by a small margin over the second-lowest bidder.

In sum, during this time period, COCCAGNA knew that COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3

were the ones creating contract and job proposals for 8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A) COMPANY 4. Furthermore, COCCAGNA knew that COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 were running these companies' contracts on a day-to-day basis and performing all of the onsite management, including supervising the subcontractors who performed a large percentage of the onsite work. To COCCAGNA's knowledge, the 8(a) Program participants were not performing any work, let alone 15% of the contract value with their own employees, and were otherwise not playing any meaningful role in the execution of these contracts. COCCAGNA knew that this arrangement represented a violation of the rules and purpose of the 8(a) Program.

*Entry of COCONSPIRATOR 4 into the Conspiracy*

COCONSPIRATOR 4 owned a company known as 8(A) COMPANY 1, which, with COCCAGNA's key assistance, was selected for a series of contracts at Letterkenny Army Depot between 2007 and 2009. Collectively, the value of these contracts was around $85 million.

COCONSPIRATOR 4 came to Letterkenny Army Depot in or around 2007 for a meeting with COCONSPIRATOR 1, COCONSPIRATOR 2, COCONSPIRATOR 3, and COCCAGNA. COCONSPIRATOR 4 was interested in getting JOC contracts at Letterkenny Army Depot. COCCAGNA anticipated that her company's relationship with COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 would be no different from that of prior 8(a) Program participants who had received maintenance and construction JOCs at Letterkenny Army Depot. In other words, COCCAGNA's expectation was that she and her existing employees, if any, would not perform 15% of the work under the contract. Furthermore, COCCAGNA's expectation was that, like prior 8(a) Program participants, COCONSPIRATOR 4 and her existing employees, if any, would not play a meaningful role in contract or job proposals, in overall contract management, or in day-to-day execution of the contract.

During this meeting, it was stated that 8(A) COMPANY 1 would subcontract much of the work under the contract to a select number of subcontractors who had been working with COCONSPIRATOR 1,

10

COCONSPIRATOR 2, and COCONSPIRATOR 3 for many years. Favored subcontractors included SUBCONTRACTOR 1, SUBCONTRACTOR 2, SUBCONTRACTOR 3, SUBCONTRACTOR 4, SUBCONTRACTOR 5, and SUBCONTRACTOR 6. Under government contracting rules, decisions about how much work to subcontract and which firms to select for subcontracts are solely the discretion of the prime contractor.

Following this one meeting, COCCAGNA does not recall COCONSPIRATOR 4 ever coming to Letterkenny Army Depot or having any contact with her otherwise. COCCAGNA never saw any equipment bearing the 8(A) COMPANY 1 name on site at Letterkenny Army Depot.

8(A) COMPANY 1 was selected for four separate JOCs. COCCAGNA's division, the Directorate of Public Works, was the requiring activity for these contracts. COCCAGNA was again the assigned contracting officer's representative on these contracts.

The first three JOCs, which were awarded in 2007, 2008, and 2009, respectively, were each worth around $3.5 million.

Each of the three $3.5 million maintenance and construction JOCs given to 8(A) COMPANY 1 were again non-competitive direct awards. In other words, COCCAGNA was again responsible for evaluating the company's technical proposals, which he understood to be written by COCONSPIRATOR 2, just like the proposals submitted for 8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A) COMPANY 4. COCCAGNA likewise provided to the contracting office a favorable evaluation of 8(A) COMPANY 1 on the basis of the company's affiliation with COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3.

8(A) COMPANY 1 was selected for these JOCs following COCCAGNA's recommendations. COCCAGNA knew, again, that contracting officers did not have the kind of visibility into the relationship between COCONSPIRATOR 1, COCONSPIRATOR 2, COCONSPIRATOR 3, and 8(A) COMPANY 1 that he had. When providing favorable recommendations to the contracting office, COCCAGNA did not disclose that COCONSPIRATOR 1,

11

COCONSPIRATOR 2, and COCONSPIRATOR 3 were previously affiliated with other 8(a) Program participants that they controlled and that they were now affiliated with a new 8(a) Program participant. COCCAGNA did not disclose that, to his knowledge, 8(A) COMPANY 1 was not performing any work or otherwise playing a meaningful role in the execution of any contracts it was awarded.

During the contract performance phase, the work proceeded in the same way as it did under the 8(A) COMPANY 2, 8(A) COMPANY 3, and 8(A) COMPANY 4 contracts. COCONSPIRATOR 1 and his subordinates were regular attendees at initial site visits, where now they represented themselves to be 8(A) COMPANY 1 employees. COCCAGNA adopted these representations in memoranda of site visits that he submitted to the contracting office. When an IGE exceeded a job cost proposal, COCCAGNA again ensured that additional funds were expended that were outside the scope of the job.

For several years starting around 2007, COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 were simultaneously affiliated with both 8(A) COMPANY 1 and 8(A) COMPANY 4. Their representations about which company they were affiliated with depended on which contract a job fell under. From COCCAGNA's perspective, however, the day-to-day performance of the work was unaffected by which company's name COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 were operating under.

In 2009, 8(A) COMPANY 1 was awarded a fourth JOC. This time, the contract ended up being worth around $60 million.

This contract was awarded through a competitive bidding process. There were two bids: one submitted by 8(A) COMPANY 1, and one submitted by 8(A) COMPANY 5, also an 8(a) Program participant. Prior to the interested parties' submission of best-and-final offers, COCCAGNA evaluated the proposals submitted by each of the two parties. He found both proposals to be capable of being made technically acceptable. As a result, COCCAGNA was aware that the primary determinant of which party got the contract would be the cost coefficient.

In this situation, the offerors' coefficient information was included in the package COCCAGNA received, but the information was redacted. COCCAGNA was, nevertheless, able to see these figures by turning the pages over and looking at them through the back of the sheets on which they were written. COCCAGNA therefore gained access to bidding information that he was not supposed to have.

Around this same time, COCONSPIRATOR 1 stopped by COCCAGNA's office. COCONSPIRATOR 1 asked COCCAGNA whether 8(A) COMPANY 1's bid would be successful. COCCAGNA told COCONSPIRATOR 1 that their coefficient would be fine, signaling that no further revision of that figure would be necessary to win the contract. In short, COCONSPIRATOR 1 solicited confidential information from COCCAGNA that COCCAGNA was not supposed to have and which COCONSPIRATOR 1 was not supposed to receive. COCCAGNA shared this confidential information, knowing that it was unlawful to do so.

This JOC contract contained a contractual provision requiring 8(A) COMPANY 1 to "perform on the site, and with its own organization, work equivalent to at least 10 percent of the total amount of work to be performed under the contract." COCCAGNA and COCONSPIRATOR 1 had a discussion that 8(A) COMPANY 1 would satisfy this requirement, on paper, again by moving actual on-site laborers onto the 8(A) COMPANY 1 payroll. COCCAGNA knew this was a violation of both the contract and the 8(a) Program rules.

Separately, 8(A) COMPANY 1 was selected for a painting contract worth about $15 million in 2009. The painting contract was outside of COCCAGNA's area, and he was not the assigned COR for that contract. He was, however, asked by the contracting office to provide an evaluation of the contractor's earlier performance, and he again provided a positive review.

COCCAGNA was not aware of any specific financial arrangement in place between COCONSPIRATOR 1, COCONSPIRATOR 2, COCONSPIRATOR 3 and the various 8(a) Program participants that he helped to receive maintenance and construction contracts at Letterkenny Army Depot. COCCAGNA did, however, understand that

13

there was a financial benefit to the individuals who were, on paper, the heads of those companies, such as COCONSPIRATOR 4.

In sum, during this time period, COCCAGNA knew that COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 were the ones creating contract and job proposals for 8(A) COMPANY 1. Furthermore, COCCAGNA knew that COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 were running 8(A) COMPANY 1's contracts on a day-to-day basis and performing all of the onsite management, including supervising the subcontractors who performed a large percentage of the onsite work. To COCCAGNA's knowledge, 8(A) COMPANY 1 was not performing any work, let alone 15% of the contract value with its own employees, and it was otherwise not playing any meaningful role in the execution of these contracts. COCCAGNA knew that this arrangement represented a violation of the rules and purpose of the 8(a) Program.

### *COCONSPIRATOR 1's COMPANY*

In or around 2011, COCCAGNA became aware of COCONSPIRATOR 1 having his own company known as COCONSPIRATOR 1's COMPANY. COCONSPIRATOR 1 registered this company as a service-disabled veteran-owned small business (SDVOSB). Similar to the 8(a) Program, SDVOSBs are eligible for certain set-aside federal government contracts. COCCAGNA wrote a series of letters of recommendation for COCONSPIRATOR 1's COMPANY starting in late 2011, as COCONSPIRATOR 1's COMPANY was seeking to get off the ground in government contracting in its own right.

COCONSPIRATOR 1's COMPANY received a series of contracts at Letterkenny Army Depot starting in or around 2011. COCCAGNA was the COR on these contracts. The last contract ended in 2018, around the time that COCCAGNA retired from Letterkenny Army Depot.

In or around 2012, a new maintenance and construction JOC was awarded by Letterkenny Army Depot, as the 2009 JOC awarded to 8(A) COMPANY 1 was soon to be exhausted. This JOC ran from around

2012 until around 2017, and its cumulative value was about $75 million.

This time, COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3 were affiliated with a new 8(a) Program participant. This company was not, however, the lowest bidder, so the JOC was instead awarded to 8(A) COMPANY 6, an 8(a) Program participant not affiliated with COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3.

*Related Conduct*

There were occasions when ad hoc construction jobs arose at Letterkenny Army Depot and no previously awarded contract was in place. In these situations, a competitive bidding process for individual jobs was at times necessary, per the requirements of the Letterkenny Army Depot contracting office.

When faced with situations of this kind, COCCAGNA sometimes asked COCONSPIRATOR 1 and COCONSPIRATOR 2 to submit multiple proposals, and in return COCCAGNA received proposals for multiple companies that they controlled. For instance, on one or more occasions, including on or about September 14, 2012, COCONSPIRATOR 1 and COCONSPIRATOR 2 sent COCCAGNA three proposals for the same job—one on COCONSPIRATOR 1's COMPANY letterhead, one on 8(A) COMPANY 1 letterhead, and one on 8(A) COMPANY 4 letterhead. COCCAGNA recognized that these proposals were all prepared by the same person, COCONSPIRATOR 2.

In these situations, COCCAGNA generally had already in mind a company to which he was planning to award the contract. Getting multiple proposals from COCONSPIRATOR 1 and COCONSPIRATOR 2 in this manner therefore allowed COCCAGNA to satisfy the contracting office's requirement on paper without having to expend time and effort speaking with multiple companies. Thus, even though COCCAGNA may not have awarded one of these contracts to a company affiliated with COCONSPIRATOR 1 and COCONSPIRATOR 2, COCCAGNA understood that that this way of handling the competitive bidding requirement was not appropriate or consistent with the

contracting office's intent in asking for multiple bids. Furthermore, it was COCONSPIRATOR 1 and COCONSPIRATOR 2's simultaneous control of multiple companies, and COCCAGNA's understanding of that arrangement, that allowed COCCAGNA to make this request and allowed COCONSPIRATOR 1 and COCONSPIRATOR 2 to comply.

Separately, in or around 2014, COCCAGNA and COCONSPIRATOR 1 discussed payments that COCONSPIRATOR 1 wanted to make to several subcontractors in connection with a U.S. Army Corps of Engineers contract that had been awarded to COCONSPIRATOR 1's COMPANY at Letterkenny Army Depot for work on a rocket motor disposal facility. These subcontractors had performed work for COCONSPIRATOR 1's COMPANY but were not fully paid for their work because the cost of the project exceeded the job cost allocation. COCCAGNA told COCONSPIRATOR 1 that COCCAGNA would speak with 8(A) COMPANY 6 about it.

COCCAGNA then solicited a manager of 8(A) COMPANY 6, the winner of the 2012 JOC, to make these subcontractors whole by inflating the amounts that they were due for a job under the JOC. COCCAGNA and COCONSPIRATOR 1 exchanged emails about this subject on or about October 16, 2014. COCCAGNA wrote, "[COCONSPIRATOR 1], [c]ould you please provide me with a listing of the outstanding amounts due to the subs for the rocket motor project that we discussed about a month ago? [8(A) COMPANY 6] wants to make sure they pay everyone the correct amounts." COCCAGNA then listed the amounts due to four construction subcontractors who regularly worked at Letterkenny Army Depot. COCONSPIRATOR 1 replied, "Jim, that looks correct[.]"

COCCAGNA knew that inflating the cost of a job on one contract to cover the costs of a job on a different contract was a violation of government contracting rules.

***

The foregoing factual recitation represents a summary of what the Government would have proved beyond a reasonable doubt, had the case against JAMES A. COCCAGNA proceeded to trial. It does not

16

represent each and every fact known to the Government or each and every fact that the Government would have proved at trial. Additionally, while names have been anonymized in this Statement of Facts, JAMES A. COCCAGNA has received an identical document in which names have not been anonymized for the avoidance of any doubt.